Harold Young, on Behalf of Himself and on Behalf of Employees of the Chicago Housing Authority, Plaintiffs-Appellants, v. Chicago Housing Authority et al., Defendants-Appellees, and Florence McNamara, Individually and on Behalf of Employees of the Chicago Housing Authority, Intervenor-Defendant-Appellees.

Gen. No. 46,002.

Opinion filed May 11, 1953. Rehearing denied June 2, 1953. Released for publication June 16, 1953.

MILTON T. RAYNOR, and GILBERT GORDON, both of Chicago, for appellants; GILBERT GORDON, of Chicago, of counsel.

TENNEY, SHERMAN, BENTLEY & GUTHRIE, of Chicago, for certain appellees; HENRY F. TENNEY, and GREGGAR P. SLETTELAND, both of Chicago, of counsel.

JOHN J. MORTIMER, Corporation Counsel, of Chicago, for certain other appellees; L. LOUIS KARTON, Assistant Corporation Counsel, of Chicago, of counsel.

A. C. LEWIS, of Chicago, for intervenor-defendant-appellees.

MR. JUSTICE BURKE delivered the opinion of the court.

██ This is an appeal by Harold Young, an employee of the Chicago Housing Authority, acting on his own behalf and on behalf of other employees, from an order dismissing the complaint for want of equity. The defendants are the Authority, the commissioners thereof, the executive secretary, the Commissioner of Police, the Chief of the Bureau of Criminal Identification, John Madden, a police officer, and Florence McNamara, individually and in a representative capacity. The acts complained of and sought to be enjoined consist of fingerprinting by the police of all employees; sending the imprints to the local, state and federal bureaus of identification for matching against those of convicted persons already on file; and the return, if matched, of information from police files to the employer. In the original complaint Harold Young claimed to represent all of the Authority's 650 employees. Florence McNamara, another employee, on behalf of herself and other employees similarly situated (about one-half of the 650 employees) with-

drew as plaintiff and was permitted to intervene as defendant in support of the Commissioners' fingerprinting program. As the case was decided on defendants' motion to dismiss, there is no dispute as to the facts. In the course of the proceedings, by stipulation and order, Harold Young was found to properly represent all of his coemployees who oppose the acts complained of, and Florence McNamara was found to properly represent all the employees who support the acts complained of.

The Chicago Housing Authority is a municipal housing corporation, organized under the "Housing Authorities Act" of March 19, 1934 (sec. 3, ch. 67½, Ill. Rev. Stat. 1951 [Jones Ill. Stats. Ann. 63.03]), for the purposes of creating low rent housing and clearing slums. It is administered by five commissioners and an executive secretary, and employs about 650 persons in various capacities—architects, engineers, housing managers, lawyers, appraisers, administrators, secretaries, typists, file clerks, glaziers, carpenters, electricians, janitors and firemen. The terms and conditions of employment are set forth in a Personnel Manual, arrived at by joint understanding between employer and employees, which includes a provision for settlement of disputes. Mr. Young is an architect employed by the Authority. The other plaintiffs are employed by the Authority in various capacities. Prior to June 23, 1952, 266 employees, including plaintiffs, delivered a petition objecting to the program of their employer. This was not acknowledged. On June 23, 1952, a "Memorandum to the Staff" was issued by the commissioners, which announced that a fingerprinting program was to begin on July 1, 1952. Mr. Young and 99 other employees were to be fingerprinted on the first day.

The Memorandum sets forth the reasons for the program, the program itself and the schedule of finger-

printing. The basic reasons were stated to be to protect tenants and employees and to protect the good name of the Authority. The program required taking two sets of imprints of each employee, sending one to the "local bureau of identification" and the other to the Federal Bureau of Investigation. Neither set would be returned to the employer, which would, however, receive police reports on identified cases of previous conviction if uncovered during a matching process. The "noncriminal" imprints would remain with the bureaus to which they were sent in "civilian files." Reports on convicted cases would be handled by the employer on an individual basis. The commissioners would endeavor to handle each case on its merits and with "full recognition that mistakes are common in life, that human beings are capable of reform, and that a good record subsequent to an early offense is a persuasive reason for encouraging continued good conduct." On the other hand, full consideration would be given to the hazards that might be involved. For example, "employees who have ready access to the apartments of tenants would doubtless be transferred to other work or dismissed if the records disclosed a history of sex offenses that might endanger women or children." The last pages of the Memorandum contain the schedule for fingerprinting by departments. The "local bureau of identification" referred to in the Memorandum is located in the Police Station at 1127 South State Street, Chicago. Its personnel secures information from the State Bureau of Identification, which is part of the Illinois Department of Public Safety. Requests to the local bureau for information concerning criminal records are transmitted by the local bureau to the State Bureau of Identification, which then returns the information to the local bureau. None of the plaintiffs is charged with

290

violation of law and the program was not instituted for any purpose pertaining to the investigation of specific crimes or violations of law by the employees or by others. Included among plaintiffs are persons who, in the past, have been convicted for violation of a criminal law and whose fingerprints are on file with the State Bureau of Identification. These persons are law-abiding citizens, whose past police record is generally unknown and, in some cases, unknown to their families. The actual fingerprinting was to be done by Police Officer John Madden.

Plaintiffs state that they are not attacking fingerprinting *per se;* that they do not question here the right of the employer to secure any and all information concerning the employees that the employer considers necessary or desirable; and that if the information sought by the employer were secured by legal means, then they (plaintiffs) would have no cause to complain. Plaintiffs challenge in this action the activities of police officials with respect to them, which activities include (a) mass police fingerprinting, (b) forwarding of imprints by the police to the State Bureau of Identification and to the Federal Bureau of Investigation, (c) return of confidential data from the state bureau to the police and (d) release of all such data by the police to the employer.

The commissioners have by statute been granted the power to impose such qualifications, terms and conditions for employment as they in their discretion may require. No stigma is attached to fingerprinting. It is widely accepted and used as a method of determining employee fitness. The obvious advantages and widespread acceptance of fingerprinting are apparent from the fact that the Armed Forces and other federal, state and local agencies, including Civil Service, have for many years required the personnel to be finger-

291

printed as an aid to investigation of their qualifications, as a deterrent to furnishing false information and to enable quick and certain identification in the event of death. Many of the employees in the instant case have access to buildings occupied by hundreds of tenants. The commissioners have a duty to protect the persons and property of the tenants and their children. The commissioners must select and screen employees with care. One of the most widely accepted screening methods is the one here proposed. It is evident that the program bears a clear relation to the welfare of the residents of the Authority projects and follows the widespread practices of public personnel management.

■ ■ What qualifications should be required of employees and the method of determining whether such qualifications are met, are left by statute to the discretion of the commissioners. As a general rule courts will not interfere with the discretionary acts of municipal officers. Plaintiffs concede that if the past history of certain employees is known, the retention of their jobs would be jeopardized. We are of the opinion that the Authority is entitled to have this known. The employer, not the employee, has the responsibility for determining qualifications for employment. The mere fact of a past criminal record, however, will not be the sole determining factor. The Memorandum sets forth clearly the reasons for the program and the method to be followed in enforcing it. The program is reasonable and within the discretionary power granted.

■ Plaintiffs say that if the information sought were secured by legal means they would have no cause to complain. We are of the opinion that the police procedure and the channels of information utilized by the commissioners to carry out the fingerprinting program conform in all respects with the laws of Illinois.

The requirement of fingerprinting as a condition of employment does not violate the rights of any employee.

For the reasons stated the decree of the superior court of Cook county is affirmed.

*Decree affirmed.*

FRIEND, P. J. and NIEMEYER, J., concur.